Jamie S. Kilberg, OSB No. 110465
jamie@kauffmankilberg.com
KAUFFMAN KILBERG LLC
1050 SW Sixth Avenue, Suite 1414
Portland, OR  97204
Telephone:  (503) 224-2595
Facsimile:  (503) 224-3203

Attorneys for Daniel Gray Kamara Baker

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:22-cr-00124-HZ |
| Plaintiff, | DEFENDANT'S SENTENCING MEMORANDUM |
| v. | |
| DANIEL GRAY KAMARA BAKER, | Sentencing Date: April 26, 2024 |
| Defendant. | |

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................ 1

II.    FACTUAL BACKGROUND AND PRESENTENCE REPORT ..................................... 2

    A.    Case Background ........................................................................ 2

    B.    The Parties' Plea Agreement ............................................................. 5

    C.    Pre-Sentence Investigation Report and Advisory Guidelines Calculation ............. 5

        1.    References in the PSR Suggesting That the Death Resulted From Mr. Baker's Distribution Should Be Removed ............................................ 6

        2.    Mr. Baker Qualifies for the Safety Valve Reduction ................................ 7

        3.    Mr. Baker is a Zero-Point Offender ................................................ 8

        4.    Advisory Guidelines Range ........................................................ 9

III.   A TIME-SERVED SENTENCE IS WARRANTED ......................................... 9

    A.    The Sentence Must Be No Greater Than Necessary to Achieve the Goals of Sentencing ............................................................................ 9

    B.    The Court Must Limit Its Sentencing Analysis to the Conduct of Conviction ..... 10

        1.    Even if the Government Were to Argue "Death Resulted," the Evidentiary Burden is Very High ............................................... 11

        2.    The Government Could Not Have Met its Burden in Any Event ............ 13

        3.    Even if Section 5K2.1 Could Be Applied, Any Departure Would Be Minimal ........................................................................ 14

    C.    Mr. Baker's History and Characteristics Warrant a Time-Served Sentence ........ 16

    D.    Mr. Baker is a First-Time Offender With a Deep Support Network Who is Unlikely to Reoffend .................................................................. 19

IV.   CONCLUSION ............................................................................ 24

Defendant Daniel Gray Kamara Baker, by and through his attorney Jamie S. Kilberg, submits this memorandum in support of sentencing.  On April 26, 2024, Mr. Baker will be sentenced following his guilty plea to Count One of the Indictment, charging him with Distribution of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C).  The posture of this case is somewhat unique.  Under the terms of the plea agreement and according to the Presentence Investigation Report ("PSR"), the government intended to try to prove at a contested sentencing hearing that a death resulted from Mr. Baker's admitted distribution.  However, the government has since confirmed it is abandoning any such efforts, notwithstanding assertions to the contrary in the final PSR issued April 11, 2024.  Because the government will not be offering at sentencing any evidence on which the Court could rely to establish that a "death resulted" from the distribution—much less the clear and convincing evidence required to impose the kind of substantial upward departure the government previously intended to seek and which the PSR suggests—the Court should sentence Mr. Baker in accordance with the applicable advisory sentencing guidelines for his actual crime of conviction: distributing approximately two grams of fentanyl.

## I.    INTRODUCTION

Mr. Baker is a young man with no prior convictions.  He is universally regarded by friends and family as a kind, compassionate person, who is always trying to help others.  He is also someone who witnessed violence in his neighborhood—even as he did he best to steer clear of it—and, as a young black man in an all-white family, someone who struggled with identity and where he fit in the community and the world.  His early aspirations for a career in basketball were dashed by a devastating knee injury, leading him down a road of depression and addiction to Xanax pills.

His addiction to Xanax pills—and ultimately counterfeit Xanax pills—led directly to his crime of conviction.  Mr. Baker was selling counterfeit Xanax pills, none of which contained fentanyl.  However, he had also obtained a small amount of blue M30 fentanyl pills for personal use.  After a counterfeit Xanax customer of his began pressing him in the fall of 2020 to sell her "percs" in addition to the counterfeit Xanax he was selling her and her boyfriend, Mr. Baker made the mistake of giving in.  On November 25, 2020, he sold approximately 20 blue M30s—all that he had—and 100 counterfeit Xanax to this admitted poly-substance-abusing customer.  Five days later, the customer's boyfriend, KB[1], died of a fentanyl overdose.  The government will *not* seek to prove that it was Mr. Baker's pills that caused KB's death.  Nor is there sufficient evidence for the Court to independently draw that conclusion.  Properly applied, the advisory Guidelines in this case call for a 0-6 month sentence.  As of the date of sentencing, Mr. Baker will have been in custody for seven months and 28 days; a time-served sentence is appropriate.

## II.    FACTUAL BACKGROUND AND PRESENCE REPORT

### A.    Case Background

On the evening of November 29, 2020, two admitted heroin, methamphetamine, and Xanax addicts, KB and Kristy Campbell, ingested narcotics in their living room.  Ms. Campbell claims she immediately began to feel ill and went into the bathroom where she passed out.  When she came-to after an unknown period of time, she found KB unconscious in the living room.  KB was breathing but was unresponsive to Ms. Campbell's attempts to wake him.  KB did not regain consciousness and later died.

---

[1] KB's full name is not included to protect his privacy as the decedent.

In an interview with the Salem Police Department and DEA agents, Ms. Campbell admitted that she and KB were poly-substance abusers, including methamphetamine, heroin, and pills. She further advised that she and KB had purchased counterfeit Xanax pills and M30 pills from an individual named "Slim" approximately five days earlier. She made no allegations that she or KB obtained any drugs other than pills from "Slim." A later toxicology report revealed that KB had, among other things, fentanyl, a specific counterfeit Xanax called Flubromazolam, and cannabinoids in his blood and urine. Reports indicate that the house was "littered" with bongs, handheld blow torches, and medicine bottles, and that it smelled of rotten food, cat urine, and vomit.

During their investigation, officers recovered a medicine bottle containing white oblong pills near where KB was found in the living room—i.e., the pills Ms. Campbell claimed KB ingested. Those pills later tested positive only for Flubromazolam. Officers claim they obtained Ms. Campbell's consent to search the home, and, while no photographs or documentation of that search itself were created or exist, officers apparently also found a second medicine bottle in an undisclosed location containing white oblong pills and blue M30 pills. The white oblong pills in the second bottle later tested positive only for Flubromazolam; the blue M30 pills tested positive for fentanyl and acetaminophen.

The officers' failure to document the location of the second pill bottle was not their only investigative failure. Inexplicably, the officers seized only the two medicine bottles and ignored the "bongs" and other paraphernalia that "littered" the home. None of it was photographed, seized, or preserved.

They also inexplicably did not seize Ms. Campbell's telephone, despite being keenly aware of its evidentiary value and significance. During their investigation, officers had

Ms. Campbell show them her communications with "Slim." DEA Task Force Officer Eugenio Zuniga either took a video or photographs of the text conversation between Ms. Campbell and "Slim" from Ms. Campbell's phone. That "conversation" was actually a series of communications dating back to early October 2020. In reviewing Ms. Campbell's conversation with "Slim," DEA TFO Zuniga learned that, throughout October, Ms. Campbell repeatedly asked "Slim" for "painkillers," "Oxy," "percs," and "30s," in addition to the counterfeit Xanax she was buying for KB. "Slim" denied having the various painkillers KB was so desperate for. In late November 2020, "Slim" responded that did have some "blues," which he clarified meant "percs" and not blue counterfeit Xanax. On November 25, Ms. Campbell and "Slim" negotiated pricing for an order of counterfeit Xanax for KB and "percs" for her. They settled on 100 counterfeit Xanax "bars" and 20 "blues."

Despite clear evidence that Ms. Campbell's phone contained evidence of her drug purchases—including, at least, her purchases of pills from "Slim"—and despite officers' knowledge that Ms. Campbell admitted she and KB were poly-substance addicts, officers did not preserve or take Ms. Campbell's phone into evidence. Instead, they took the word of an admitted addict that her best guess was that KB ingested a pill from a bottle found near his body, and that "Slim" was the one who sold those pills. Once investigators identified "Slim," they ended their investigation and failed to seize relevant and potentially exculpatory evidence.

Officers then asked Ms. Campbell to use her phone to contact "Slim" to set up another deal. With the assistance of law enforcement, Ms. Campbell contacted "Slim" and asked for additional pills, which he agreed to provide. At the direction of officers, Ms. Campbell specifically asked for more counterfeit Xanax and more "percs." A deal was set up to take place at a Plaid Pantry in Salem, Oregon, in the early morning hours of November 30, 2020. When

"Slim" arrived at the Plaid Pantry, defendant Daniel Baker was taken into custody without incident.

When he was arrested, Mr. Baker was found in possession of white oblong pills that later tested positive only for counterfeit Xanax (again, Flubromazolam).  None contained fentanyl.  Mr. Baker had no "percs" or M30s.  Following his arrest, officers conducted a search of Mr. Baker's home.  There, they discovered a significant number of white oblong pills in his living room that tested positive only for Flubromazolam.  On his kitchen counter, officers found several pill fragments and "residue" that tested positive for Flualprazolam (another form of counterfeit Xanax), caffeine, and fentanyl.

### B.       The Parties' Plea Agreement

On November 2, 2023, Mr. Baker pleaded guilty to one count of distribution of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  *See* ECF No. 48.  At the time of the plea agreement, the government had intended to argue that the fentanyl Mr. Baker sold to Ms. Campbell on November 25, 2020, caused KB's death.  As noted above, however, the government has since abandoned that argument.  Absent any enhancement, the plea agreement requires the government to seek a sentence within the applicable Guidelines range. *Id.* ¶ 12.

### C.       Pre-Sentence Investigation Report and Advisory Guidelines Calculation

Because the government is proceeding to sentencing based solely on the fentanyl distribution, there are unresolved objections to the PSR that materially affect the calculation of the advisory Guidelines: reductions for the safety valve and for Mr. Baker's status as a zero-point offender.

1.      **References in the PSR Suggesting That the Death Resulted From Mr. Baker's Distribution Should Be Removed**

In objecting to the PSR, Mr. Baker noted that the calculated advisory Guidelines were based on a presumption that "death resulted" from Mr. Baker's distribution.  Specifically, the PSR declined to give reductions both for the safety valve and for Mr. Baker being a zero-point offender because both reductions do not apply in cases where death or serious bodily injury results.  Similarly, in making its ultimate recommendation, including a substantial upward departure under Section 5K2.1, the PSR simply assumes that Mr. Baker's distribution resulted in the death here, without articulating any evidence that would support such a finding by clear and convincing evidence.  *See* PSR ¶ 87.

Mr. Baker argued that it was inappropriate for the PSR to adopt an upward departure finding without citing to sufficient evidentiary support, particularly where, at the time, the issue of whether death resulted from the distribution was to be the subject of a contested evidentiary hearing.  The Addendum to the PSR, however, declined to make the requested changes and kept the PSR's suggestion that an upward departure was warranted.

Now, however, the government has confirmed that it cannot meet its burden to prove that death resulted from Mr. Baker's distribution.  Accordingly, it will be offering no evidence at sentencing on which the Court could rely in imposing an upward departure under Section 5K2.1, and it *will not* be asking the Court to impose any sentence other than a sentence in line with the applicable advisory Guidelines range.  As a result of this concession, all references in the PSR to death resulting from the distribution should be removed and language should be added to the PSR to make clear that the government cannot prove that "death resulted" from the distribution.

These changes are critical; if the Court elects to impose a sentence that carries additional imprisonment time, a finding—or even suggestion in the PSR—that death resulted from the

distribution could have significant negative effects on Mr. Baker's security and risk classifications. With references and findings regarding death removed from the PSR, there are two Guidelines reductions that the PSR declined to make that must now be made: the safety valve and the zero-point offender adjustments.

### 2.     Mr. Baker Qualifies for the Safety Valve Reduction

Section 2D1.1(b)(18) of the advisory Guidelines applies a two-point reduction for defendants who satisfy the provisions of Section 5C1.2(a), relating to the safety valve, regardless of whether there is an applicable mandatory minimum at issue. *See* U.S.S.G. § 2D1.1(b)(18) ("If the defendant meets the criteria set forth in paragraphs (1)-(5) of subsection (a) of § 5C1.2 . . ., decrease by 2 levels."). Section 5C1.2 is met when:

(1) the defendant does not have more than four criminal history points, a prior three-point offense, or a prior two-point violent offense;

(2) the defendant did not use violence or credible threats of violence, or possess a firearm or other dangerous weapon;

(3) the offense did not "result in death or serious bodily injury to any person";

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense; and

(5) the defendant provides truthful information to the government regarding his offense, as set forth in Section 5C1.2(a)(5).

There is no dispute that Mr. Baker meets the qualifications listed in Section 5C1.2(a)(1) – (a)(2) and (a)(4) – (a)(5). Moreover, as noted, the government has conceded that it cannot meet its evidentiary burden to prove that "the offense . . . result[ed] in death or serious bodily injury" pursuant to Section 5C1.2(a)(3), will not be asking the Court to make that determination, and

will not be offering the Court any evidence on which the Court could rely in reaching that conclusion.  Accordingly, all provisions of the safety valve have been met.  This should reduce Mr. Baker's total offense level by two levels.

### 3.      Mr. Baker is a Zero-Point Offender

Section 4C1.1 of the advisory Guidelines applies a two-point offense-level reduction for certain offenders who:

(1)    have no criminal history points;

(2)    did not receive a terrorism adjustment under § 3A1.4;

(3)    did not use violence or credible threats of violence;

(4)    did not commit an offense that resulted in death or serious bodily injury;

(5)    did not commit a sex offense;

(6)    did not personally cause financial hardship;

(7)    did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon;

(8)    did not commit an offense covered by § 2H1.1 (involving individual rights);

(9)    did not receive an adjustment under § 3A1.1 (hate crime) or § 3A1.5 (serious human rights offense); and

(10)  did not receive an aggravating role adjustment and was not engaged in a continuing criminal enterprise.

As noted in paragraphs 39-41 of the PSR, Mr. Baker has zero criminal history points. There is no dispute that Mr. Baker meets the qualifications listed in Section 4C1.1(a)(1) – (a)(3) and (a)(5) – (a)(10).  And, as noted above, because the government has conceded it cannot prove death resulted from the conduct and will not be offering any evidence on which the Court could

rely for such a finding, Mr. Baker also meets the final provision in Section 4C1.1(a)(4). This should reduce Mr. Baker's total offense level by two additional levels.

### 4.    Advisory Guidelines Range

Incorporating those changes, the advisory Guidelines range should be calculated as follows:

| | |
|---|---|
| 2D1.1(a)(5) / (c)(14) – base offense level | 12 |
| 2D1.1(b)(18) / 5C1.2 – safety valve | -2 |
| 3E1.1 – acceptance of responsibility | -2 |
| 4C1.1 – zero-point offender | -2 |
| **TOTAL OFFENSE LEVEL** | **6** |

With zero criminal history points and a total offense level of 6, the applicable advisory Guidelines range is 0-6 months, prior to any adjustments, in Zone A of the Guidelines table. Mr. Baker has been in custody for approximately eight months. PSR at 1 ("Release Status").

## III.    A TIME-SERVED SENTENCE IS WARRANTED

Mr. Baker has already been in custody longer than the high-end of the Guidelines range. Immediate release is warranted.

### A.    The Sentence Must Be No Greater Than Necessary to Achieve the Goals of Sentencing

As an initial matter, under the parsimony principle in 18 U.S.C. § 3553, Congress has instructed the courts that they "shall impose a sentence sufficient, but not greater than necessary, to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); 18 U.S.C. § 3553(a). Even sentences within the advisory Guidelines range can be

"greater than necessary" to serve the objectives of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 111 (2007) (finding that district court's below-Guidelines sentence not unreasonable because "it appropriately framed its final determination in line with § 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary to accomplish the goals' of sentencing"). While the sentencing courts "'must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process,'" *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016), the district judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009) (*per curiam*) (Guidelines are "not to be *presumed* reasonable").

The Court must consider several factors other than the advisory Guidelines in determining an appropriate sentence, including the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; and the need for the sentence to afford adequate deterrence. 18 U.S.C. § 3553(a). Here, the crime of convictions is distributing two grams of fentanyl. Even the advisory Guidelines concur: a lengthy prison sentence is not appropriate.

**B.      The Court Must Limit Its Sentencing Analysis to the Conduct of Conviction**

Although the PSR asserts that a death occurred as a result of Mr. Baker's distribution, the government will not be pursuing that argument at sentencing—and it will not be offering any evidence on which the Court could rely to conclude the death resulted from the distribution. Indeed, there is substantial doubt that Mr. Baker's distribution caused KB's death here. Accordingly, the Court should sentence Mr. Baker based exclusively on the actual count of

conviction and appropriate relevant conduct: distribution of approximately 2 grams of fentanyl (a

Schedule II controlled substance) and several hundred counterfeit Xanax pills (Flubromazolam)

(at best, a Schedule IV controlled substance).

### 1.    Even if the Government Were to Argue "Death Resulted," the Evidentiary Burden is Very High

Had the government pressed its argument that "death resulted," it would be asking for a

1,250%, 20-level upward departure from the otherwise-applicable high-end of the Guidelines

range of 6 months, to the 75 months set forth in the plea agreement (ECF No. 50 ¶ 12) pursuant

to Section 5K2.1 of the advisory Guidelines.  Such a disproportionate increase in the sentence

would have to be established by clear and convincing evidence.  *See United States v. Staten*, 466

F.3d 708, 720 (9th Cir. 2006) (holding that "facts found in support of Guidelines enhancements

that turn out to have a disproportionate impact on the ultimate sentence imposed" must "be

established by clear and convincing evidence"); *United States v. Mezas de Jesus*, 217 F.3d 638,

642 (9th Cir. 2000) (clear and convincing evidence required to apply nine-level enhancement

based on uncharged kidnapping, causing increase from 21-27 months to 57-71 months)

In *United States v. Valensia*, 222 F.3d 1173 (9th Cir. 2000), *vacated on other grounds*,

532 U.S. 901 (2001), the Ninth Circuit laid out six factors for courts to consider in determining

whether the requested finding results in a disproportionate increase, thus requiring clear and

convincing evidence:

1. Does the enhanced sentence fall within the maximum sentence for the crime alleged in the indictment?

2. Does the enhanced sentence negate the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment?

3. Do the facts offered in support of the enhancement create new offenses requiring separate punishment?

4.  Is the increase in sentence based on the extent of a conspiracy?

5.  Is the increase in the number of offense levels less than or equal to four?

6.  Is the length of the enhanced sentence more than double the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence?

In that particular case, the court found *none* of the six factors were met, and the heightened standard was not applied. *Id.* at 1182. Here, however, at least three of the factors are met. The enhancement, if found, would necessarily provide a factual basis for charging a separate crime—specifically, the 20-year mandatory minimum found in 21 U.S.C. § 841(b)(1)(C). It would increase the number of offenses levels by far more than four: from 6 to 26. And it would far more than double the length of the sentence—indeed, it would more than duodecuple it—in a case where the defendant would otherwise receive a relatively short sentence. Under that precise scenario, the Ninth Circuit has expressly *required* the clear and convincing evidence standard. *United States v. Pineda-Doval*, 614 F.3d 1019, 1041 (9th Cir. 2010) (requiring clear and convincing evidence when three *Valensia* factors are met, including that the finding more than doubled the sentence, increased offense level by more than four, and provided a basis for charging a separate crime—in that case a murder enhancement for transporting illegal aliens resulting in death).

The government would also have to establish that Mr. Baker intended or knowingly risked the decedent's death. *United States v. Durham*, 941 F.2d 858, 864 (9th Cir. 1991) (vacating Section 5K2.1 departure because defendant did not intend or knowingly risk the decedent's death); *United States v. Brady*, 928 F.2d 844, 850 (9th Cir. 1991) (vacating Section 5K2.1 departure because jury found the defendant did not "intend" to kill both decedents).

### 2.    The Government Could Not Have Met its Burden in Any Event

There are a variety of reasons why the government could not have established by clear and convincing evidence that Mr. Baker's distribution resulted in the death here.  Those will be summarized below.  If the Court were inclined to make findings regarding whether death resulted, notwithstanding the government's abandonment of that theory and its election not to proffer any evidence at sentencing on which the Court could rely to make such a finding, Mr. Baker would request the opportunity to expound upon these failures, including with documentary and/or testimonial support.

- KB and Ms. Campbell were admitted poly-substance abusers, including methamphetamine, heroin, and pills.  However, the evidence regarding Mr. Baker is that he only sold Ms. Campbell pills.  Ms. Campbell and KB *necessarily*, then, had other dealers, any one of whom could have supplied the lethal fentanyl.  The DEA inexplicably only examined Ms. Campbell's communications with Mr. Baker—even though it knew she was the person who arranged the drug deals—and never seized or otherwise preserved her phone.

- KB's blood and urine toxicology showed fentanyl, counterfeit Xanax (Flubromazolam), and cannabinoids.  The cannabinoids results were not confirmed, and no apparent attempt was made to confirm them—even though both law enforcement and the medical examiner's investigation showed that bongs and drug paraphernalia "littered" the home.  None of the bongs or other materials were seized or tested as possible sources of fentanyl.

- Ms. Campbell reported she only saw KB take Mr. Baker's counterfeit Xanax before she passed out in the bathroom for an unknown period of time.  She could not possibly know what, if anything, KB ingested or where he got it after she passed out.  Moreover, the pills found near KB's body only tested positive for counterfeit Xanax (Flubromazolam)—not fentanyl.  KB, therefore, *must* have ingested other drugs, perhaps drugs laying around the home.

- Chemicals were found in KB's blood that were *not* found in any pill linked to Mr. Baker, including a chemical that can be a precursor added in synthetic fentanyl production (and thus would be in any tested pill containing it).  However, a "quantitative result" for that chemical was "not reported because a quantitative assay is not available in [the DEA] laboratory."  Despite this limitation, no effort was made to obtain a quantitative result through the use of a laboratory that had the necessary equipment.  Without more analysis, it is impossible to determine whether the chemical was, in fact, a precursor that would have existed in any pill

pre-ingestion, or was simply a metabolite of fentanyl created post-ingestion. Because no tested pills had that chemical in them, if it was indeed a precursor, that necessarily means Mr. Baker's pills could not have been the source of the fentanyl that caused KB's death.

- Fentanyl residue found in Mr. Baker's apartment contained caffeine, but the fentanyl pills found in KB's home did not, suggesting a different fentanyl source.

- The fentanyl pills found in KB's home contained acetaminophen, but the fentanyl residue found in Mr. Baker's apartment did not, again suggesting a different fentanyl source.

- The residue found in Mr. Baker's apartment also contained a different counterfeit Xanax compound, Flualprazolam, but *none* of the pills found in KB's home (either fentanyl or Flubromazolam) did.

- No testing was done on Ms. Campbell's blood to confirm fentanyl, even though she claimed she and KB both ingested Mr. Baker's pills.

Each of these substantial gaps in evidence make it impossible for the government to have met its burden.  Similarly, the Court should not rely on assertions made in the PSR to support any finding that any variance or upward departure from the applicable advisory Guidelines range is warranted.

### 3. Even if Section 5K2.1 Could Be Applied, Any Departure Would Be Minimal

Even if the Court were to find that some kind of upward departure is warranted based solely on the assertions in the PSR—notwithstanding the inherent gaps summarized above—the Court should exercise its discretion to not impose any significant departure.  Section 5K2.1 sets forth the factors the Court should consider in determining the scope of any departure:

*First*, the Court is to consider "the defendant's state of mind."  As noted above, a departure is not warranted if the defendant did not intend or knowingly risk the decedent's death. *Durham*, 941 F.2d at 864; *Brady*, 928 F.2d at 850.  Here, Mr. Baker did not intend to harm anyone.  As evidenced by the volume of pills found on his person and in his vehicle at the time

of his arrest, and in his home afterward, Mr. Baker sold counterfeit Xanax. It was not his customary practice to sell fentanyl pills. Indeed, the evidence suggests this was the only time he sold fentanyl pills.

_Second_, the Court looks at "the degree of planning or preparation" involved. This was minimal here. Ms. Campbell had been reaching out to Mr. Baker for nearly two months, trying to purchase fentanyl pills, which he did not have or did not want to sell her because whatever he had was for his personal use. In late November 2020, she reached out again and he relented.

_Third_, the Court considers "whether multiple deaths resulted." That did not happen here.

_Fourth_, the Court considers "the means by which life was taken." In this case, the means was a self-induced overdose by an admitted poly-substance addict who knew the risks associated with drug abuse.

_Fifth_, the Court considers "the dangerousness of the defendant's conduct." Fentanyl is admittedly a decidedly dangerous drug even though the vast majority of individuals who take fentanyl do not overdose.

_Sixth_, the Court considers "the extent to which death or serious bodily injury was intended or knowingly risked." This factor appears largely duplicative of the first factor. Certainly there is no argument that Mr. Baker intended any injury or harm, though all parties involved surely had some understanding of the real risk posed by fentanyl distribution and ingestion.

_Finally_, the Court considers "the extent to which the offense level for the offense of conviction . . . already reflects the risk of personal injury." It is universally recognized that the Sentencing Commission departed with its traditional approach and crafted Guidelines for drug offenses not tied to any empirical data, but rather tied directly to mandatory minimums and

statutory sentences.  Those statutory schemes were put in place with such significant sentences precisely because of the risks of personal injury caused by illegal substances.  In a very real sense, then, the Guidelines themselves already consider this risk.

Because the factors detailed in Section 5K2.1 almost entirely favor Mr. Baker, any departure—notwithstanding the anticipated lack of evidence presented by the government at sentencing—should be mild at best.  Indeed, a sentence commensurate with the amount of time Mr. Baker has already served (eight months) would reflect a 33% increase above the top end of the otherwise applicable Guidelines range if there had been no death at all (0-6 months).

### C.     Mr. Baker's History and Characteristics Warrant a Time-Served Sentence

Whether or not the government could establish that Mr. Baker's distribution caused the death in this case, Mr. Baker feels tremendous guilt that he engaged in such dangerous behavior as selling fentanyl, risking the lives of others.  In his letter to the Court, Mr. Baker acknowledges the risk and harm he has caused:

> For starters, I want to take this time to let you know just how deeply regretful I am of all of this.  I don't know if my pills caused this tragedy, but it sickens me to think they could have.  If the court is to find that my actions caused this tragedy for [KB] and his friends and family, I am willing and ready to take full responsibility of any punishment that may come my way.

**Exhibit 1** at 1.  He recognizes how his own addiction clouded his judgment, that he was "a walking zombie, that had no idea of the hurt that I was causing the world."  *Id.* at 2.  He asks the Court for a "chance to help the community, and to make amends with all those that I possibly caused harm."  *Id.*  Mr. Baker's background and history provide some insight into how he found himself an addict.

Mr. Baker grew up a black child in a white family.  He did not know his father, who is black, until he was already 18 years old.  Instead, he grew up with his mother (Diane Baker),

stepfather (Dan Baker), and younger half-sister.  PSR ¶¶ 46-47.  Since the age of five, Mr. Baker

and his family lived in the Woodlawn neighborhood in Northeast Portland.  The nearby

Woodlawn City Park was the home to the Woodlawn Park Bloods gang.  Ex. 1 at 1.  Although

Mr. Baker avoided getting involved with the gang directly, it had an enormous impact on him—

one he kept secret from his mother for years.  *See, e.g.*, **Exhibit 2** (collection of letters of support

from family) at 1 (Mrs. Baker noting that her son "witnessed many bad things in the park" and

that while she was not aware of them, her son later "revealed a lot of stuff . . . that happened in

the park" and that he "witnessed many traumatic incidents").  When he was a young teenager,

older gang members in the park cajoled him into trying marijuana for the first time, and

subjected him to sex abuse, forcing him to have sex with sex workers in the park as a minor.

PSR ¶ 48.  Mr. Baker hid this from his family.  *Id.*

He also battled the side effects of medication for severe ADHD.  He reports that he was

prescribed medication that, over time, led to him feeling depressed.  As he describes it, he

"started smoking marijuana to 'even it out,'" eventually becoming so dependent he would smoke

marijuana before basketball games.  Ex. 1 at 1.  Still, it looked like basketball and sports might

save him.  As a younger child, he ran track and played basketball and football.  As a teenager, he

focused in on basketball, making the junior varsity team as a freshman, and even getting some

playing time on varsity, and eventually making 2nd Team All State his senior year.  *Id*.

He was an excellent ball player, and a career beyond high school looked not only possible

but likely.  However, just as things were coming together for him, Mr. Baker tore his meniscus.

As he writes (*id.*):

> That was a devastating blow to me, and I felt like my world came
> crashing down.  I was in so much pain with my knee and started
> getting pills from a friend to cope with the pain that I was in
> because I wasn't able to get prescription pills.  Sadly, that's what

Page 17   -   DEFENDANT'S SENTENCING MEMORANDUM

> started a long journey of dependency, dependence of altering my
> mind and my body with drugs.  I became addicted and started
> finding other pills that I could take as I put the hopes and dreams
> of playing in the NBA behind me.

Mr. Baker lost his purpose and once again fell into a depression and cycle of addiction that lasted for years, including through the date of his arrest in November 2020.  Like his teenage trauma, he hid his depression from his family.  PSR ¶ 55.  He began taking "three Xanax pills every single day for 5-7 years straight."  Ex. 1 at 1.  He "never stopped . . . never took a break . . . [and] never thought of a different route."  *Id.*  His depression got so bad he even tried to overdose on Xanax at 20 years old.  PSR ¶ 56.  He eventually began selling Xanax pills to make money.  Ex. 1 at 1.  The Xanax pills "helped [Mr. Baker] deal with or numb the pain that [he] was feeling."  *Id.* at 2.

Mr. Baker's struggles with Xanax addiction led to him obtaining a small number of M30 fentanyl pills.  He had first used fentanyl several months before his arrest, using a partial pill several times per week.  PSR ¶ 65.  Seeing an opportunity to make some money when Ms. Campbell asked for "percs" and "painkillers," he agreed to sell all of his M30 fentanyl pills to her on November 25, 2020.  Although neither he nor the Court can know for sure whether his fentanyl pills actually caused KB's death, the mere fact that it could have has shaken Mr. Baker.  He struggled on pretrial release, eventually leading to his release being revoked eight months ago.  He struggled with the group therapy VOA put him in during his release.  PSR ¶ 66.  Mr. Baker knows he needs treatment, and he looks forward to obtaining individual therapy to get to the root of his personal battles with depression that led to his addictive behaviors.

Mr. Baker's time in custody has been well-spent.  He has taken stock of his life to date, and realizes he bears a serious responsibility to make the community better upon his release:

> If I am able to get out and get back on the streets I want to first take as many counseling sessions and drug courses as I can because I know that this problem is rooted deep inside me. I want to take what has happened to me as a learning lesson that I can teach to the youth. I want to be a motivational speaker and hopefully help young boys that were once in my position with guidance and help on dealing with the rollercoaster of becoming a man. I feel like that is my duty, to help stop the cycle of young black men coming to jail or, worse, losing their life due to drugs.
>
> I feel responsible for the next generation's success because if I don't share what I now know and help them, I am only contributing to the problem. I pray that I am able to touch and change the lives of many people with my story. I want to get out and become a father, live a healthy and positive lifestyle, and make the changes that I know are possible.

Ex. 1 at 2. While in custody, Mr. Baker reports that he attends weekly counseling and has completed several ACES courses—including Anger Management 1-6, Nutrition, Parenting, Poetry, Communication, Introduction to Health, Linear Equations, Systems & Functions of Human Body, Stress Management, Introduction to Consumer Math, and Introduction to U.S. Government. Regardless of the Court's sentence, he plans to continue to take advantage of any programming and counseling that the Bureau of Prisons offers.

### D.    Mr. Baker is a First-Time Offender With a Deep Support Network Who is Unlikely to Reoffend

Mr. Baker is a true first-time offender with no criminal history. The Court is empowered to—and should—take that into account when arriving at an appropriate sentence. *See, e.g.*, *United States v. Paul*, 561 F.3d 970, 973, 977 (9th Cir. 2009) (where defendant convicted of embezzlement and Guidelines called for 10-16 months' imprisonment, court's within-Guidelines sentence of 15 months unreasonably high in part because defendant was first-time offender with no criminal record). Even Mr. Baker's placement in Criminal History Category I does "not fully account for his complete lack of criminal history" because a defendant with a *minor* criminal

history still falls in the same category.  *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009); *see also United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008) (rejecting government's argument that Guidelines already consider first conviction and holding that "a district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis").  This remains true even after the 2023 implementation of the so-called Zero-Point Offender reduction in Section 4C1.1.

Relatedly, the U.S. Supreme Court has made clear that the likelihood that defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper v. United States*, 562 U.S. 476, 492 (2011).  The Sentencing Commission itself has long-ago concluded that true first-time offenders statistically pose one-third to one-half the risk of re-offending as compared to defendants with prior minimal criminal histories.  *See* U.S.S.C., "Recidivism and the 'First Offender,'" available at https://www.ussc.gov/sites/default/files/pdf/ research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (May 2004), at 13-14 (noting first offender recidivism rate of 11.7%, compared to recidivism rates of 22.6% (offenders with one criminal history point) and 36.5% (offenders with two or more criminal history points)) (last visited Mar. 27, 2024); *see also United States v. D.M.*, 942 F. Supp. 2d 327, 346 (E.D.N.Y. 2013) (concluding that sentence of probation appropriate for defendant facing Guidelines recommendation of 78-97 months, in part, because little likelihood defendant will engage in future criminal conduct).

Mr. Baker poses a low risk of reoffending. He has both an incredibly strong and deep support system in place, and he has used his time in custody to refocus and become goal-oriented.

1. <u>Support System</u>. Mr. Baker's support system has demonstrated its depth and strength through the letters from numerous family members, personal friends, and family friends attached as **Exhibit 2** (family), **Exhibit 3** (close friends), and **Exhibit 4** (family friends). The letters include people who have watched Mr. Baker grow up, people whose lives Mr. Baker has impacted, and people who know him best.

Mr. Baker's family members recount how Mr. Baker is a caregiver and peacemaker who excels at bringing people together. *See, e.g.*, Ex. 2 at 2 (Diane Baker (mother) noting his "capacity for connection, for peace making, for bringing people together"); *id.* at 4 (Debra Baker (sister) noting he is "a kind-hearted individual who has always been a peacemaker"); *id.* at 5 (Sara Baker-Gonzalez (aunt) noting he "is still the kind, thoughtful, helpful person he always was"); *id.* at 6 (Mary Jo Brown (aunt) noting he comes from "a family dedicated to helping others").

Mr. Baker's close personal friends echo his family's praise for Mr. Baker's inclusive capacity. No fewer than three people who wrote letters consider Mr. Baker to be their best friend. *See* Ex. 2 at 1-4 (letters from Nikolaus Popp, Jonah Calhoun, and Aidan Silvis). All three recount Mr. Baker's consistent selflessness and support during their own struggles. *Id.* at 1 (Mr. Popp characterizing Mr. Baker as "inherently selfless and noble" with an "exuberant and playful personality," who has "consistently provided unwavering support, even during times when he struggled to do so for himself"); *id.* at 3 (Mr. Calhoun recalling in detail how Mr. Baker was "the only friend that I felt comfortable enough to call" when suffering a bout of depression);

*id.* at 4 (Mr. Silvis noting that "Daniel was there for me" when "I had nothing and nowhere to go").

Mr. Baker's friends similarly are uniform in their praise for his generosity and his ability to uplift others around him.  *Id.* at 3 (praising Mr. Baker's treatment of others, noting "I've never seen him walk past a homeless person, or someone in need, and not stop and give them anything he had in his pocket"); *id.* at 4 (recalling how Mr. Baker will "help the homeless by either giving them food, or money if he had it," and recalling going to Mr. Baker's house to "find that he had people staying with him who couldn't afford to rent a house"); *id.* at 6 (remarking on Mr. Baker's "inherent goodness" and "remarkable ability to uplift others" and bring "smiles to the faces of those around him"); *id.* at 7 (Mr. Baker shows "kindness and generosity at every opportunity" by "the way he treats and talks to people," giving "everyone the same respect and admiration"); *id.* at 11 (Mr. Baker "could honestly be friends with anyone").  The sister of one of Mr. Baker's childhood friends worked for a program providing prison inmates with a college education; she recalled how she "often drew on Daniel's uncanny ability to notice when someone isn't a part of the conversation and bring them in the space in a lighthearted and unnoticed way," which she saw him "do the same for countless others."  *Id.* at 8.

Mr. Baker's family and friends also reflected in their letters on his contributions to the community through public speaking, animal care, cooking, and his innate talents for music, dance, and design.  *See, e.g.*, Ex. 2 at 2-5 (letters referencing public speaking, animals, clothing, music, dancing, and cooking); Ex. 3 at 5 (noting that Mr. Baker "is known in our city for helping musicians craft their sound and promote their music"); *id.* at 5 (noting Mr. Baker's "importance in the music community" and his feature in well-known Portland-based rap video); *id.* at 10 (noting Mr. Baker's "irreplaceable gift for movement" and dance, where he "found a way to

focus energy, channel emotions, and become lost in flow").  Mr. Baker has started a clothing line called "To The Top."  *See, e.g.*, Ex. 4 at 2 (describing clothing line).  Prior to his incarceration, he could be found on the streets of downtown Portland, distributing his clothing line and filming to build a social media presence for his endeavor.  He sells shirts, pants, shorts, and sweatshirts, with his stylized logo and brand name:




In short, Mr. Baker's family and close friends all portray a young man with enormous potential; a kind, generous, and giving friend; and a community-oriented entrepreneur and artist. He has a tremendous support network, which will help him as he transitions back into the community and stays off the path he was previously on.  Having come clean to his family and friends about the depths of his past traumas and his mental health struggles (*see, e.g.*, Ex. 3 at 1 ("Unfortunately, Daniel has often felt compelled to conceal certain aspects of his identity to protect himself in environments where perceived weakness is exploited."); PSR ¶ 48 (describing how Mr. Baker did not reveal past trauma to his family)), he now knows they fully support him.

2.      Goals.  In addition to his support system greatly reducing the likelihood of re-offending, Mr. Baker has clear goals to work toward for the first time.  As noted above, he has used his time in custody to complete numerous programming packets offered by the Sheridan Federal Detention Center.  His mother also reports that she has been sending him books to read, and they exchange communications, reflecting on the books.  Ex. 2 at 2.  He has also been

writing, and he hopes to be able to write a novel or other collections of works about his life and experiences.  *Id.*

Mr. Baker is particularly interested in working as a coach "to give children a positive sports experience," PSR ¶ 52, or to speak publicly to youth—especially young boys—so they can learn from his mistakes, Ex. 1 at 2.  And, of course, he wants to continue his interest in art—in particular, in music/dance, clothing design, and the culinary arts.  Having a clear set of goals, a strong foundation in at least some of those goals (i.e., his art forms), strong community and familial support, and his commitment (as expressed in his letter to the Court) to seek individual counseling and treatment, will help Mr. Baker remain a low risk of re-offending.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Baker, who has been in custody for eight months, respectfully requests that the Court sentence him to time-served.  While a man tragically died from a fentanyl overdose, the government will not be asking this Court to find that Mr. Baker's distribution caused the death.  Accordingly, the properly calculated Guidelines range is 0-6 months, making Mr. Baker's eight months in custody more than sufficient.


Respectfully submitted this 17th day of April, 2024,


KAUFFMAN KILBERG LLC


 *s/ Jamie S. Kilberg*
JAMIE S. KILBERG
OSB No. 110465
Telephone: (503) 224-2595

Attorneys for Defendant Daniel Gray Kamara Baker